# EXHIBIT A

**SALTZ MONGELUZZI BENDESKY P.C.**
BY: ROBERT J. MONGELUZZI/ANDREW R. DUFFY/
MICHAEL A. BUDNER/ MAX H. DEHON
IDENTIFICATION NO. 36283/77121/314776/334148
52ND FLOOR
1650 MARKET STREET
PHILADELPHIA, PA  19103
(215) 496-8282
*ATTORNEYS FOR PLAINTIFF*



*Filed and Attested by the Office of Judicial Records 11 JAN 2024 10:25 am C. SMITH*

**CLEARFIELD & KOFSKY**
BY: ADAM E. GRUTZMACHER/ANTHONY LOPRESTI/
BENJAMIN C. HOFFMAN
IDENTIFICATION NO: 92061/93515/311628
1617 JOHN F. KENNEDY BLVD.
SUITE 355
PHILADELPHIA, PA 19103
(215) 563-3333
*ATTORNEYS FOR PLAINTIFF*

| | |
|---|---|
| **KRISTEN BEHRENS, as the Administratrix of the ESTATE OF T.S., a deceased minor**<br>1500 Market Street, Suite 3500E<br>Philadelphia, PA 19102<br><br>*Plaintiff*<br><br>vs.<br><br>**CITY OF PHILADELPHIA**<br>City Solicitor's Office<br>1600 Arch Street<br>Philadelphia, Pennsylvania 19103<br><br>*And*<br><br>**OFFICER EDSAUL MENDOZA,**<br>**in his individual and official capacity**<br>Detention Center<br>8201 State Road<br>Philadelphia, PA 19136<br><br>*Defendants* | **PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION**<br><br>**JANUARY TERM, 2024**<br><br>**No.**<br><br>**JURY OF 12 DEMANDED** |

<u>**NOTICE TO DEFEND**</u>

1

<table>
<tr><td>

"NOTICE

"You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by an attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

"YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNEOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.
IF YOU CANNEOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL and INFORMATION SERVICE
One Reading Center
Philadelphia, Pennsylvania 19107
(215) 238-1701"

</td><td>

"AVISO

"Le han demandado en corte. Si usted quiere defenderse contra las demandas nombradas en las páginas siguientes, tiene veinte (20) días, a partir de recibir esta demanda y la notificatión para entablar personalmente o por un abogado una compareencia escrita y tambien para entablar con la corte en forma escrita sus defensas y objeciones a las demandas contra usted. Sea avisado que si usted no se defiende, el caso puede continuar sin usted y la corte puede incorporar un juicio contra usted sin previo aviso para conseguir el dinero demandado en el pleito o para conseguir culquier otra demanda o alivio solicitados por el demandante. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE ABOGADO (O NO TIENE DINERO SUFICIENTE PARA PARGAR A UN ABOGADO), VAYA EN PERSONA O LLAME POR TELEFONO LA OFICINA NOMBRADA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASSISTENCIA LEGAL. ESTA OFICINA PUEDE PROPORCIONARLE LA INFORMACION SOBRE CONTRATAR A UN ABOGADO.

SI USTED NO TIENE DINERO SUFICIENTE PARA PAGAR A UN ABOGADO, ESTA OFICINA PUEDE PROPORCIONARLE INFORMACION SOBRE AGENCIAS QUE OFRECEN SERVICIOS LEGALES A PERSONAS QUE CUMPLEN LOS REQUISITOS PARA UN HONORARIO REDUCIDO O NINGUN HONORARIO.

ASSOCIACION DE LICENDIADOS DE FILADELFIA
SERVICO DE REFERENCA E INFORMACION LEGAL
One Reading Center
Filadelfia, Pennsylvania 19107
Telefono: (215) 238-1701"

</td></tr>
</table>

## COMPLAINT

Plaintiff, Kristen Behrens, as Administratrix of the Estate of T.S., a deceased minor, by and through her attorneys, Saltz Mongeluzzi Bendesky P.C. and Clearfield & Kofsky, alleges that Philadelphia Police Officer Edsaul Mendoza, in his individual capacity as a Philadelphia Police Officer, killed T.S. in violation of the United States Constitution and in support thereof, avers as follows:

## PARTIES

1.    Plaintiff, Kristen Behrens, is the Administratrix of the Estate of T.S., a deceased minor. See Letters of Administration, attached hereto as "**Exhibit A**".

2.    At the time of his death on March 1, 2022, T.S. was a citizen of the Commonwealth of Pennsylvania residing at 951 Daly Street, Philadelphia, PA 19148.

3.    Defendant, City of Philadelphia is a municipality in the Commonwealth of Pennsylvania and is officially responsible, through its Police Commissioner, for the policies, practices and customs of the Philadelphia Police Department with a principal place of business at

2

City Hall, c/o City Solicitor's Office, 1600 Arch Street, Philadelphia, Pennsylvania 19103.

4.     At all times material hereto, Defendant, City of Philadelphia, has owned, operated, maintained, and was responsible for, and/or otherwise controlled the South Task Force and/or 1st Police District.

5.     At all times material hereto, Defendant, City of Philadelphia, provided police services to the City and County of Philadelphia.

6.     Defendant, Edsaul Mendoza, is an adult citizen and a resident of the Commonwealth of Pennsylvania, currently residing at Detention Center, 8201 State Road, Philadelphia, PA 19136.

7.     Defendant Edsaul Mendoza was a police officer with the Philadelphia Police Department at all times relevant hereto.

8.     At all times relevant hereto, Defendant Mendoza was a Philadelphia police officer assigned to the South Task Force and/or 1st Police District.

9.     Defendant Mendoza's actions that are the subject matter of this Complaint involve his employment as a police officer and at all times relevant to this action, he was acting under color of law and within the scope of his employment pursuant to statutes, ordinances, regulations, policies, customs and usage of Defendant City of Philadelphia and its police department. Defendant Mendoza is also being sued in his individual capacity for his actions.

## THE KILLING OF T.S.

10.     On March 1, 2022, at or around 7:30 p.m., T.S., a 12-year-old juvenile, was riding his bike with a friend, N.K., a 17-year-old juvenile, in the area of 18th and Barbara Streets in Philadelphia, Pennsylvania.

11.     On March 1, 2022, Defendant Mendoza was on duty assigned to the South Task Force and/or 1st Police District. Defendant Mendoza was dressed in street clothes or

3

Case ID: 240101396

"plainclothes" rather than in his police uniform.

12.     On March 1, 2022, Defendant Mendoza was in an unmarked vehicle with 3 other officers from the Philadelphia Police Department's Criminal Intelligence Unit: Officer Kwaku Sarpong, Officer Robert Cucinelli, and Officer Alexander Camacho. Officers Sarpong, Cucinelli, and Camacho were all in street clothes or "plainclothes," as well, rather than in police uniforms.

13.     According to Presentment No. 3 of County Investigating Grand Jury XXXI in the matter of In re: The Thirty First Investigating Grand Jury, Philadelphia Court of Common Pleas, Misc. No. 0001458-2021, Notice C-13, Defendant Mendoza and the other aforementioned officers initiated a pedestrian stop of T.S. and N.K. because they recognized N.K. as "tangentially connected to a stolen firearm." See Presentment No. 3, attached hereto as "**Exhibit B**".

14.     T.S. was not the target of the officers' investigation that night and no Philadelphia Police Department representative has indicated there being any information about T.S. possessing a firearm at any point during 2022.

15.     At around 7:30pm, the officers saw two boys riding bikes southbound on 18th Street.  The two boys rode past their car and Officer Sarpong decided to drive the car around the block and re-approach the boys from the south.

16.     Officer Sarpong did not activate the police lights at this point and none of the four officers called for uniform backup.

17.     Officer Camacho stated that upon seeing the two boys, he recognized one as N.K.

18.     None of the officers recognized the other boy, the smaller one, T.S.

19.     As they circled back, the officers saw the two boys standing next to their bikes on the northeast corner of 18th and Barbara Streets.

Case ID: 240101396

20.    The officers decided that they would stop the boys while they were in plainclothes and an unmarked car although Philadelphia Police Department directives specifically require that "police officers in plainclothes and detectives will not routinely make traffic stops unless the actions of the violator are a clear danger to pedestrian or vehicular traffic and no marked unit is readily available."

21.    None of the officers had seen either of the boys in possession of a gun when they made the decision to conduct the pedestrian stop and none of them saw the boys involved in any criminal activity.

22.    Nothing either boy did, before the initiation of the stop, required the officers to initiate the stop in an unmarked car with officers in plainclothes.

23.    Further complicating the stop, none of the officers had any information that N.K. was in possession of the stolen firearm at any time within the previous week.

24.    The only evidence of N.K.'s possession of a gun appeared to be the stolen firearm that was in an Instagram posted one week earlier inside of a home and not on the street.

25.    Indeed, the purported reason for the stop varied between the officers.

26.    Officer Sarpong, the driver, and the person who had actual control over the car, and therefore, the decision to make the stop asserted that "[w]e were stopping [N.K.] in particular to get a good address on [N.K.] because we was pretty much planning on doing a social media job on him because we knew he was 17 years of age."

27.    Officer Sarpong did not say anything about wanting to stop T.S.

28.    Sgt. Butler, the supervisor of the officers, offered a similar explanation for the stop, stating that they were making the stop "[b]ecause they recognized one of the individuals as being involved in the investigation, meaning [N.K.]."

Case ID: 240101396

29.    In contrast, Officers Camacho and Cucinelli, stated that they intended to stop the boys for a traffic violation, i.e., riding their bicycles the wrong way on 18th Street, in addition to the firearms investigation.

30.    Neither officer offered this reason when questioned by OIS investigators on either March 1 or March 3.

31.    Neither officer appears to have told their supervisor about this reason for the stop, and it appears nowhere in the subsequent police paperwork.

32.    Officer Camacho, after asserting that issuing a motor vehicle ticket was part of the reason for their stop, later acknowledged that he did not give anyone a ticket during this entire encounter and "we never – I don't give tickets for the most part."

33.    Despite making this decision to conduct a stop, Officer Sarpong did not put on the lights to indicate that this was an undercover police car while they drove up to the boys.

34.    While Defendant Mendoza and Officers Sarpong, Cucinelli, and Camacho were in the area of 18th and Barbara Streets at approximately 7:30 p.m. on March 1, 2022, a gunshot was fired, which broke the rear passenger-side window of the undercover, unmarked car in which Defendant Mendoza and Officers Sarpong, Cucinelli, and Camacho, were riding.

35.    After the shot went off, T.S. and N.K. ran up the block of 1700 Barbara Street, where the two separated.

36.    All four officers exited the car.

37.    T.S. was running alone on the sidewalk toward Moyamensing Avenue.

38.    Defendant Mendoza pursued T.S. at the aforesaid time and place.

39.    Defendant Mendoza was alone, and none of the other three officers saw what happened at the other end of the street.

6

Case ID: 240101396

40.    Officer Mendoza did not take cover during his approach of T.S., which would have been the tactically correct decision if he believed T.S. remained armed.

41.    Instead, he chose to follow the "exact opposite" tactical strategy that would be expected if he thought there was "any possibility" that T.S. remained armed.

42.    Specifically, Officer Mendoza runs up the street, completely exposed, without backup, and then runs between two parked cars to confront T.S., who was behind the cover of a pickup truck.

43.    Instead of taking cover or approaching cautiously, Officer Mendoza runs onto the sidewalk without slowing or reassessing, finds T.S. unarmed and not fleeing, and fires one shot into T.S.'s back from within ten feet.

44.    Ultimately, Defendant Mendoza fired 3 shots at T.S.: (1) the first shot was at the bottom of the block near the intersection of 18th and Barbara Streets; (2) the second shot was mid-block after T.S. had discarded his firearm; (3) the third shot was after T.S. had discarded his firearm, was unarmed, had stopped running, and either fell or dove to the ground – Defendant Mendoza fire a shot from less than  ten feet away into T.S.'s back while he was face down on the ground.

45.    T.S. sustained that single fatal gunshot wound while he was unarmed, face down on the street.

46.    The single gunshot wound killed him after a period of conscious pain and suffering of at least 90 seconds.

47.    Defendant Mendoza sustained no injuries.

48.    It is clear, based on witness testimony, crime scene evidence, and audio and video evidence available, that by the time Officer Mendoza fired his second of three shots, T.S. did not possess a gun and could not have pointed it at Officer Mendoza.

7

Case ID: 240101396

49.     When Officer Mendoza fired the third and fatal shot, he knew that 12-year-old, 5 foot tall, 111-pound T.S. no longer had a gun, and therefore, no ability to harm him.

50.     The murder was conducted execution style, while T.S. "was essentially facedown on the sidewalk" and "in a position similar to a push-up."

51.     As a result of Defendants' misconduct, T.S.'s survivors seek compensation for the economic and non-economic losses they have suffered as a result of his death, including medical expenses, funeral and burial expenses, costs of estate administration, the pecuniary value of the services, support, comfort, care and society he would have provided to them had he not died and damages for the incalculable emotional and psychological losses they have suffered as a result of T.S.'s death.

## THE SYSTEMIC AND UNABATED FAILURES OF THE PHIALDELPHIA POLICE DEPARTMENT

52.     The Philadelphia Police Department promulgates rules, policies and procedures through directives.

53.     At all times material hereto, Defendant, City of Philadelphia, was responsible for adopting and enforcing rules, policies and directives regarding the conduct and deportment of members of the Philadelphia Police Department.

54.     At all times material hereto, Defendant, City of Philadelphia's written policies provided that only the minimal amount of force necessary to protect human life should be used by all police officers.

55.     At all times material hereto, Defendant, City of Philadelphia's written policies provided that police officers will exhaust all reasonable means of apprehension and control before resorting to the use of deadly force.

Case ID: 240101396

56.     At all times material hereto, Defendant, City of Philadelphia's written policies provided that deadly force will be used only as a last resort.

57.     At all times material hereto, Defendant, City of Philadelphia's written policies provided that police officers shall not use deadly force against another person, unless they reasonably believe they must protect themselves or another person present from imminent death or serious bodily harm.

58.     At all times material hereto, Defendant, City of Philadelphia's written policies provided that police officers should ensure their actions do not precipitate the use of deadly force by placing themselves or others in jeopardy by taking unnecessary, overly aggressive, or improper actions.

59.     Philadelphia Police Department Directive 10.1 speaks to the Use of Force Involving the Discharge of Firearms.

60.     Philadelphia Police Department Directive 10.1 includes specific prohibitions, which include provisions that state:

> a.  "[p]olice officers shall ensure their actions do not precipitate the use of deadly force by placing themselves or others in jeopardy by taking unnecessary, overly aggressive, or improper actions. It is often tactically superior police procedure to withdraw, take cover or reposition, rather than engage in the immediate use of force."
>
> b.  "Police officers shall not discharge their firearms to subdue a fleeing individual who presents no immediate threat of death or serious bodily injury to the officer or another person."

61.     A policy of the Philadelphia Police Department mandates that "[p]olice officers shall not use deadly force against another person unless they have an objectively reasonable belief that they must protect themselves or another person from death or serious bodily injury. Furthermore, an officer is not justified in using deadly force at any point in time where there is

Case ID: 240101396

no longer an objectively reasonable belief that the suspect is dangerous, even if deadly force would have been justified at an earlier point in time."

62.    The directives state that "[p]olice officers using their professional judgment should not discharge their weapon when doing so might unnecessarily endanger innocent people."

63.    Philadelphia Police Department Directive 10.8 warns of the perils of plainclothes policing – "civilians may not immediately recognize plainclothes officers, prompting calls to 911 or unpredictable behavioral responses."

64.    Directive 10.8 is posted on the Department's website but is heavily redacted and does not include guidance on pedestrian stops.

65.    The directive does advise that unmarked cars should not "routinely" make traffic stops and should not initiate a pursuit "barring exigent circumstances."

66.    One of the purposes of working in an undercover capacity is to blend in and conduct surveillance, and thus, making traffic stops somewhat defeats that purpose.

67.    This practice of having an undercover unit make a traffic stop also goes against general police practices beyond Philadelphia directives.

68.    The decision to initiate a pedestrian stop when officers are in an unmarked vehicle and wearing plainclothes is also tactically problematic, and wearing a badge around the chest is not an effective way for officers to identify themselves.

69.    Despite these Philadelphia Police Department Directives, Defendant Mendoza did not comply with them because of systemic failures by the City of Philadelphia to train, supervise and discipline officers that have been involved in the excessive and deadly use of force.

70.    The use of excessive and deadly force by Philadelphia Police Officers is a common practice that has become a custom in the Philadelphia Police Department due to the

Case ID: 240101396

failure to train, supervise and discipline officers that subscribe to and employ the custom and practice of excessive and deadly force.

71.    Despite these Philadelphia Police Directives, Defendant Mendoza fired at a fleeing T.S., who was laying on the ground, executing him with a single gunshot.

72.    This is an abysmal systemic policy failure by the Philadelphia Police Department's policy makers and the City of Philadelphia's leadership.

73.    In 2013, the Philadelphia Inquirer reported that despite an overall decrease in crimes and violence directed towards police officers in Philadelphia, the number of shootings by Philadelphia Police Officers resulting in serious bodily injury or death had climbed to their highest levels in over a decade.

74.    The Philadelphia Inquirer reported that Philadelphia had one of the highest rates of shootings by police in the United States of America.

75.    In response to the national spotlight directing its attention to this crisis in Philadelphia, Philadelphia Police Commissioner Charles H. Ramsey stated that he believed Philadelphia had "a solid policy and consider it best practice" concerning shootings by police.

76.    In the years prior, the Philadelphia Police Department abolished an "accountability" officer position after the release of a comprehensive report on shootings by police.  The report noted a "troubling trend that deserves close attention and monitoring" concerning shootings by police.

77.    Since as early as 2004, the City of Philadelphia was aware of a custom, policy or practice subscribed to by Philadelphia Police Officers where they fired more shots than necessary at suspects.

78.    Despite his assertion that the Philadelphia Police Department had a "solid policy" that he considered to be "best practice," Commissioner Ramsey requested technical assistance

Case ID: 240101396

from the U.S. Department of Justice Office of Community Oriented Policing Services to "reform deadly force policies, practices, and related processes in the PPD, taking into account national standards, best practices, current and emerging research, and community expectations."

79.     The DOJ issued a report in 2015 and the results were scathing.

80.     According to the DOJ Report, from 2007 to 2015, roughly once a week, 390 times during the course of eight years, Philadelphia Police officers opened fire at "suspects."

81.     The shootings involved 454 officers.

82.     Fifty-nine suspects were unarmed and uncovered a common theme – officers incorrectly believed they were reaching for a weapon, and most often, were holding onto an object such as a cellphone.

83.     In the report, the DOJ correctly identified Philadelphia's turbulent history of police violence and corruption.

84.     In 1979, the DOJ sued the City of Philadelphia over police brutality.

85.     Six years later, in a standoff with the radical group Move, the Philadelphia Police dropped a bomb on the house and allowed the fire to burn for nearly an hour before trying to control it.

86.     Six adults and five children were killed, and 250 people were left homeless after the fire destroyed 61 homes.

87.     Between 2016 and 2022, more than 900 claims were filed against Philadelphia police officers for excessive force.

88.     The DOJ report found repeated flaws in the conduct of the Philadelphia Police and its administrative oversight, finding that the police training is weak, oversight is spotty, and that shootings are all too frequent.

Case ID: 240101396

89.     Officers are not routinely given less lethal tools like stun guns and receive inadequate training on how to defuse situations without violence and the DOJ wrote, "[i]instructors should train students not only when and how to use force, but when and how not to use force and to de-escalate, verbally and tactically."

90.     Philadelphia is the nation's fifth largest city but maintains the only police department that has more than 1,000 officers and does not offer a field training program for new officers.

91.     Instead, according to the DOJ, the new officers are assigned to foot patrol and "[a]s a result, recruits can be thrown into situations where their only guidance comes from their rookie partner."

92.     The DOJ report, in stark contrast to Philadelphia Police Department policymakers' assertions, found that (1) officers do not receive a regular, consistent training on the department's deadly force policy; (2) officers are not adequately trained on the use of deadly force; (3) the department's use of force policies are fragmented and confusing; (4) officers are not provided sufficient alternatives to the use of deadly force; (5) officers are not adequately trained on techniques to de-escalate citizen encounters and thus reduce the use of deadly force; (6) the department's disciplinary mechanism is inconsistent, subject to chronic delays, and frustrated by inadequate investigations; and (7) 73% of officers that were found to have violated department policy during a shooting incident were not suspended or terminated.

93.     The City of Philadelphia has been on notice of inadequate training, supervision, discipline, policies, procedures, directives and customs regarding police usage of excessive and deadly force since as early as 2013.

94.     The City of Philadelphia and its police department have failed to implement the DOJ Report's recommendations.

Case ID: 240101396

95.     The City of Philadelphia's inadequate training, supervision, discipline, policies, procedures, directives and customs caused the execution of T.S.

96.     Even if the Philadelphia Police Department had enacted rules intended to prohibit or curtail the behaviors and actions that caused the death of T.S., the City of Philadelphia's refusal and failure to discipline officers that violate department policy or engage in behaviors that cause serious bodily injury and death is Philadelphia Police Department custom and tradition.

97.     The Philadelphia Police Department's custom and tradition of refusing and failing to discipline officers who break rules, violate policy and engage in behaviors that cause serious bodily injury and death is celebrated by the Police Department's bargaining unit, the Fraternal Order of Police Philadelphia Lodge #5, and silently acquiesced to by the City of Philadelphia despite its knowledge of these constitutionally flagrant customs and traditions.

98.     The Philadelphia Police Department's custom and tradition of refusing and failing to discipline officers who break rules, violate policies and engage in behaviors that cause serious bodily injury or death is well known by Philadelphia Police Officers.

99.     On the rare occasion that Philadelphia Police Officers are penalized, officers are aware that even if they are disciplined, suspended or even terminated, the City of Philadelphia's acquiescence to inadequate disciplinary due process will likely result in a reversal of any ordered discipline that is adverse to Philadelphia Police Officers.

100.     Officers in the Philadelphia Police Department consider disciplinary suspensions and terminations to be paid time-off or paid vacation because of the high likelihood that their discipline will be reversed, and they will be awarded back pay and promotions at some point during the City of Philadelphia's faulty and sham arbitration process.

14

101.    An example of the City of Philadelphia's faulty and sham arbitration process for police officers involves Officer Ryan Pownall.

102.    Officer Pownall shot David Jones in the back while Jones was fleeing.

103.    It was the second time Officer Pownall shot a man in the back as he ran away.

104.    After being charged with murder, Officer Pownall garnered the full support of the Philadelphia Police Department's bargaining unit, the Fraternal Order of Police Philadelphia Lodge #5.

105.    Another example of the City of Philadelphia's faulty and sham arbitration process for police officers involves the shooting of Phillipe Holland, a delivery driver that was shot by two Philadelphia Police Officers that failed to properly identify themselves or adhere to Philadelphia Police Department directives concerning the discharge of firearms into vehicles.

106.    Both officers returned to the street shortly after their use of excessive force on Mr. Holland.

107.    Philadelphia Police Officers are aware of the custom and tradition in the Philadelphia Police Department that it is almost guaranteed that there will be no significant consequences for shooting people.

108.    The City of Philadelphia's policymakers know that Philadelphia Police Officers conduct themselves in a manner knowing that it is almost guaranteed that they will face no significant, or even meaningful consequences for shooting people.

109.    The City of Philadelphia tacitly approves the unconstitutional customs that originate from this wicked frame of mind.

## THE SOUTH TASK FORCE DEATH SQUAD

110.    The South Task Force and Defendant Mendoza that executed T.S. were known as "cowboys."

15

Case ID: 240101396

111.    Individuals they arrested frequently thought they were being carjacked, robbed or stalked.

112.    The South Task Force sought to enforce their policy of policing and do it by any means necessary.

113.    The South Task Force officers wear plainclothes.  They drive unmarked civilian cars.

114.    The South Task Force is designed to blend in – and for its victims to not even realize they are part of the Philadelphia Police Department.

115.    In April of 2022, the Philadelphia Inquirer conducted an investigation into the South Task Force and put to light the "any means necessary" mentality of this renegade police unit.

116.    Prior to the execution of T.S., the South Task Force had a reputation in law enforcement circles as a brash and freewheeling group whose members displayed an intense devotion to their jobs and were often found in chaotic situations.

117.    The South Task Force formed around 2019 and was flawed from its inception.

118.    The South Task Force spawned from a vision from a previous iteration – the South Gang Task Force which was piloted to rove the streets of South Philadelphia in 2013 and assigned to gather intelligence on people labeled "gang offenders," often using social-media surveillance.

119.    The South Gang Task Force proved to be a failed experiment – officers misinterpreted social media, overpoliced, failed to fulfill its purpose of providing targeted resources and support, and was ultimately disbanded.

120.    The current South Task Force uses many of the same policing practices, such as intense social media monitoring to guide on-the-ground surveillance and simply to generate as

Case ID: 240101396

many arrests as possible.

121.    The South Task Force is not equipped with body-worn cameras, and as a result, the position "attracts cowboys" and it "encourages cowboyism."

122.    In fact, some officers were accused of physical abuse and fabrication before they were elevated to the South Task Force, being rewarded with a position of even less oversight, accountability, and responsibilities.

123.    For example, Officer Sean McKnight was fired in 2013 after being criminally charged with beating a man while on duty – shattering his orbital bone – and falsifying charges to cover it up.

124.    Officer McKnight was rehired by the Philadelphia Police Department in 2016 and was then later rewarded by being assigned to the South Task Force.

125.    In 2018, two other officers, including Officer Robert Cucinelli who was part of the unit in which Defendant Mendoza executed T.S., were involved in a fatal shootout prior to joining the South Task Force.

126.    They killed 48-year-old Charles Meadows after he fled a bicycle stop.

127.    Five years later, the Philadelphia Police Department has not publicly said whether the shooting was justified. Yet, both officers were rewarded and remained stationed with the South Task Force.

128.    Plainclothes units such as the South Task Force have been prone to scandals across the country – because they encourage renegade and cowboy behavior.

129.    Eight members of Baltimore's now-infamous plainclothes Gun Trace Task Force were convicted of racketeering and other charges.

130.    In New York City, a plainclothes anticrime unit was dismantled over complaints of unconstitutional tactics.

Case ID: 240101396

131.    Hans Menos, a vice president for the Center for Policing Equity and the former head of Philadelphia's Police Advisory Commission stated that units such as the South Task Force lack basic guardrails – and when concerns are raised, police officials downplay them and blame them on inherent risks associated with policing.

132.    As illuminated by Philadelphia Police Department Directive 10.8 related to plainclothes policing, "unpredictable behavior" is an anticipated and expected response to officers wearing plainclothes and do not otherwise identify themselves as police, such as the South Task Force.

133.    This is in direct contradiction to the means and methods employed by the South Task Force as part of their "by any means necessary approach."

134.    The South Task Force is a "jump-out squad" – the officers employ the element of surprise – jumping out of their unmarked civilian car, in clothes with no police markings, no bodycams, but with weapons drawn.

135.    According to Terance Jones, a former Philadelphia police officer, the South Task Force has a reputation in that "these guys always jump out at you and don't identify themselves."

136.    Another South Philadelphia resident recognizes the South Task Force as "terrorizing people."

137.    According to the resident, "they will ride by and say, 'get down! Hands on the ground.' [To] people just walking down the street."

138.    This type of renegade and coyboyism permeated the ranks of the South Task Force and was ratified by the City of Philadelphia.

139.    The South Task Force and Defendant Mendoza abided by their own set of rules – their own laws – a code which allowed them to accomplish their goals "by any means necessary" and to wreak terror upon the South Philadelphia community with no oversight, no responsibility,

Case ID: 240101396

and no accountability.

## COUNT I: WRONGFUL DEATH ACTION

140.    Plaintiff incorporates each allegation set forth above the same as though fully set forth herein.

141.    Plaintiff, Kristen Behrens, as Administratrix of the Estate of T.S., a deceased minor, hereby brings Wrongful Death claims pursuant to 42 Pa.C.S. § 8301 and Pa.R.C.P. 2202(a), on behalf of all those persons entitled by law to recover damages as a result of the wrongful death of T.S.

142.    T.S. died intestate.  He did not have children.  Therefore, his beneficiaries are his parents.

143.    Plaintiff claims all available damages under the Pennsylvania Wrongful Death Statute for financial contributions and the loss of future services, support, society, comfort, affection, guidance, tutelage, and contribution that the Plaintiff's decedent, T.S., would have rendered to the wrongful death beneficiaries but for his traumatic, untimely and unnatural death occurring as a result of Defendants' conduct.

**WHEREFORE**, Plaintiff, Kristen Behrens, as Administratrix of the Estate of T.S., a deceased minor, claims of Defendants sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

## COUNT II: SURVIVAL ACTION

144.    Plaintiff incorporates each allegation set forth above the same as though fully set forth herein.

145.    Plaintiff claims on behalf of the Estate of T.S. all damages suffered by the Estate by reason of the death of T.S., including without limiting the generality of the following: the

Case ID: 240101396

fatal gunshot wound and all of the attendant effects of the gunshot wound; death; the anxiety, horror and fear of impending and certain death, mental disturbance, pain, suffering, and other intangible losses which T.S. suffered prior to death; the loss of future earning capacity suffered by T.S. from the date of his death until the time in the future he would have lived had he not been caused by Defendants to be executed and their carelessness, recklessness, gross negligence, recklessness, and willful and wanton conduct as laid out herein.

146.    Plaintiff brings this action on behalf on behalf of the Estate of T.S., by virtue of the Survival Act, 41 Pa.C.S.A. § 8302, and claims all benefits of the Survival Act on behalf of T.S's Estate, and all other persons entitled to recover under law.

**WHEREFORE**, Plaintiff, Kristen Behrens, as Administratrix of the Estate of T.S., a deceased minor, claims of Defendants sums in excess of the jurisdictional threshold in compensatory damages, punitive damages, delay damages, interest and allowable costs of suit and brings this action to recover same.

### COUNT III: 42 U.S.C. § 1983 EXCESSIVE FORCE, AGAINST DEFENDANT, OFFICER EDSAUL MENDOZA INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY

147.    Plaintiff incorporates each allegation set forth above the same as though fully set forth herein.

148.    Defendant, Edsaul Mendoza's constitutional torts are not governed or limited in any way by 42 Pa.C.S. § 8541, *et seq.* or 42 Pa.C.S. § 8521, *et seq.*

149.    At all times material hereto, Defendant Mendoza acted under color of state law.

150.    Defendant Mendoza's actions on the occasion in question were wrongful, malicious and reckless in depriving T.S. of his constitutional rights.

Case ID: 240101396

151.     Defendant Mendoza, without legal or necessary justification or the need to do so, used excessive and deadly force as described above and killed T.S.

152.     Defendant Mendoza, without legal or necessary justification or the need to do so, used excessive and deadly force pursuing T.S. and shooting T.S. while he was unarmed, in the prone position, and posing no threat of harm.

153.     Defendant Mendoza denied T.S.'s right to be free from the use of excessive force in violation of the Fourth Amendment to the United States Constitution.

154.     The force used by Defendant Mendoza was objectively unnecessary, excessive and unreasonable under the circumstances, as T.S. did not pose an immediate threat to the safety of Defendant Mendoza or others.

155.     Defendant Mendoza embarked on a willful, malicious, reckless and outrageous course of conduct that was intended to cause and, in fact did cause T.S.'s death and his family to suffer extreme and severe mental and emotional distress, anxiety, terror and agony.

156.     Plaintiff seeks survival damages, as stated above, including for the nature and extent of T.S.'s injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff, Kristen Behrens, as Administratrix of the Estate of T.S., a deceased minor, claims of Defendants, jointly and/or severally, sums in excess of $50,000.00, in addition to interest, costs, delay damages, and damages, compensatory and punitive, pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

### COUNT IV: *MONELL* – MUNICIPAL LIABILITY
### AGAINST DEFENDANT CITY OF PHILADELPHIA

157.     Plaintiff incorporates each allegation set forth above the same as though fully set forth herein.

Case ID: 240101396

158.    Defendant, City of Philadelphia, is a municipal entity that is subject to suit pursuant to 42 U.S.C. § 1983.

159.    Defendant, City of Philadelphia's constitutional torts are not governed or limited in any way by 42 Pa.C.S. § 8541, *et seq.* or 42 Pa.C.S. § 8521, *et seq.*

160.    The conduct of Defendant Mendoza evinces the excessive and unreasonable use of force in violation of T.S.'s constitutional rights.

161.    The conduct described in this Complaint and the training and disciplinary failures of the Philadelphia Police Department demonstrate that the City of Philadelphia failed to properly train officers in the probable cause or reasonable suspicion to stop or otherwise detain a citizen, the use of deadly force, the excessive use of force, and the identification of an actual or imminent threat of death or bodily injury, which was a moving force in the deprivation of T.S.'s constitutional rights and life.

162.    Prior to March 1, 2022, the Philadelphia Police Department knew or should have known of these training failures through the Department of Justice Report, the failed experiment of the South Gang Task Force and South Task Force, complaints filed against officers, civil lawsuits, settlements, and media coverage.

163.    Defendant Mendoza's conduct and the training and disciplinary failures of the Philadelphia Police Department demonstrates that the City of Philadelphia failed to enforce and promulgate written policies regarding the use of deadly force, discharges of firearms, the excessive use of force and identification of an actual or imminent threat of death or serious bodily injury, which was a moving force in the deprivation of T.S.'s constitutional rights and life.

164.    The conduct described in this Complaint, as well as the supervision and disciplinary failures of the Philadelphia Police Department demonstrates that the City of

Case ID: 240101396

Philadelphia failed to supervise and discipline police officers that use excessive force, and by doing so tacitly approved, ratified a culture, and established a custom of unlawful and unconstitutional excessive and deadly use of force, particularly in shooting incidents, which was a moving force in the deprivation of T.S.'s constitutional rights and life.

165.    By reason of the policies, practices, rules, culture, and customs described in this Complaint, Plaintiff's beneficiaries experience severe pain and suffering and the loss of their son, for which they are entitled to recover damages.  The acts and omissions described in this Complaint caused T.S.'s pain and suffering, loss of enjoyment of life, and death.

166.    Plaintiff seeks survival damages, as stated above, including for the nature of T.S's injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages available under the law.

**WHEREFORE**, Plaintiff, Kristen Behrens, as Administratrix of the Estate of T.S., a deceased minor, claims of Defendants, jointly and/or severally, sums in excess of $50,000.00, in addition to interest, costs, delay damages, and damages, compensatory and punitive, pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

### COUNT V: ASSAULT AND BATTERY
### AGAINST DEFENDANT EDSAUL MENDOZA

167.    Plaintiff incorporates each allegation set forth above the same as though fully set forth herein.

168.    As described in this Complaint, Defendant Mendoza, while acting within the course and scope of his duties as a police officer for the Philadelphia Police Department, without warrant, necessity, or legal justification, assaulted and battered T.S. by pointing his gun at T.S. and shooting him, thereby causing T.S.'s injuries and death.

Case ID: 240101396

169.    Plaintiff seeks survival damages, including for the nature and extent of T.S.'s injuries, pre-death pain and suffering, emotional distress, and loss of life and enjoyment of life, as well as all available wrongful death damages under the law.

**WHEREFORE**, Plaintiff, Kristen Behrens, as Administratrix of the Estate of T.S., a deceased minor, claims of Defendants, jointly and/or severally, sums in excess of $50,000.00, in addition to interest, costs, delay damages, and damages, compensatory and punitive, pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

### COUNT VI: PUNITIVE AND EXEMPLARY DAMAGES
### AGAINST DEFENDANT EDSAUL MENDOZA

170.    The conduct of Defendant Mendoza was reckless, malicious, willful, and wanton.

171.    Accordingly, Plaintiff requests punitive and exemplary damages to deter this type of conduct in the future.  In the alternative, Defendant Mendoza's reckless disregard of T.S's rights, safety, welfare, and life is more than momentary thoughtlessness, inadvertence or misjudgment.  This conduct is unconscionable, gross and indecent.  Resultingly, Plaintiff requests punitive and exemplary damages be awarded against Defendant Mendoza.

**WHEREFORE**, Plaintiff, Kristen Behrens, as Administratrix of the Estate of T.S., a deceased minor, claims of Defendants, jointly and/or severally, sums in excess of $50,000.00, in addition to interest, costs, delay damages, and damages, compensatory and punitive, pursuant to Pa.R.C.P. §238, and brings this action to recover the same.

### CLAIM FOR RELIEF

**WHEREFORE**, Plaintiff requests that judgment be entered against all Defendants for damages to be determined at trial, and for all other and further relief as the Court may deem just and equitable.

**SALTZ MONGELUZZI BENDESKY P.C.**

Case ID: 240101396

BY: _____*/s/ Robert J. Mongeluzzi*_____

      ROBERT J. MONGELUZZI
      ANDREW R. DUFFY
      MICHAEL A. BUDNER
      MAX H. DEHON
      *Attorneys for Plaintiff*

**CLEARFIELD & KOFSKY**

BY: _____*/s/ Adam E. Grutzmacher*_____
      ADAM E. GRUTZMACHER
      ANTHONY LOPRESTI
      BENJAMIN C. HOFFMAN
      *Attorney for Plaintiff*

Date: January 11, 2024

Case ID: 240101396

## **VERIFICATION**

The averments or denials of fact contained in the foregoing are true based upon the signer's personal knowledge or information and belief. If the foregoing contains averments which are inconsistent in fact, signer has been unable, after reasonable investigation, to ascertain which of the inconsistent averments are true, but signer has knowledge or information sufficient to form a belief that one of them is true. This Verification is made subject to the penalties of 18 Pa. C.S. §4904, relating to unsworn falsification to authorities.


DATE: January 9, 2024                        _____
                                             KRISTEN BEHRENS, ESQUIRE

Case ID: 240101396

# EXHIBIT A

Case ID: 240101396

LETTERS OF ADMINISTRATION

**REGISTER'S OFFICE**
PHILADELPHIA COUNTY, PA

№ **A3584-2022**

ESTATE OF **Thomas Joseph Siderio Jr**

Social Security No. **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**

WHEREAS, **Thomas Joseph Siderio Jr**

late of **4518 Benson Street, Philadelphia, PA 19136**

died on the **1st** day of **March** , **2022** ;
and

WHEREAS, the grant of letters of administration is required for the administration of said estate.

THEREFORE, I, TRACEY L. GORDON, Register for the Probate of Wills and Grant of Letters Testamentary and of Administration, in and for the County of Philadelphia in the Commonwealth of Pennsylvania, hereby certify that I have granted Letters of Administration

to **Kristen L Behrens**

who ha **s** duly qualified as **Administratrix** of the estate of the above named decedent and ha **s** agreed to administer the estate according to law, all of which fully appear of record in the Office of the Register of Wills of Philadelphia County, Pennsylvania.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of my office, at Philadelphia, the **12th** day of **July** **2022**

_Deputy Register_

10-36 (Rev. 10/99)

Case ID: 240101396

# EXHIBIT B

Case ID: 240101396

## THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## TRIAL DIVISION

IN RE:                                    :        MISC. NO. 0001458-2021
                                          :
THE THIRTY-FIRST                          :
                                          :
INVESTIGATING GRAND JURY                  :        NOTICE C-13


## ORDER TO UNSEAL PRESENTMENT NO. 3


AND NOW, this ___28th___ day of April, 2022 the Court hereby orders that a redacted

copy of Presentment No.3 of County Investigating Grand Jury XXXI in the above-captioned

matter be unsealed and referred to the Clerk of Court for filing as a public record. The Court

further orders that the page containing the Grand Jury Foreperson's signature be removed from

the unsealed copy and be retained under seal by the Clerk of Court.


BY THE COURT:

MIA R. PEREZ
Supervising Judge
Thirty-First County
Investigating Grand Jury

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
TRIAL DIVISION

| | | |
|---|---|---|
| IN RE: | : | MISC. NO. 0001458-2021 |
| | : | |
| THE THIRTY-FIRST COUNTY | : | |
| | : | |
| INVESTIGATING GRAND JURY | : | NOTICE C-13 |

TO THE HONORABLE MIA R. PEREZ , SUPERVISING JUDGE:

## PRESENTMENT NO. 03

We, the Thirty-First County Investigating Grand Jury, were impaneled pursuant to the

Investigating Grand Jury Act, 42 Pa. C.S.A. § 4541 et. seq., and have been charged by the Court

to investigate the facts and circumstances surrounding the shooting and killing of twelve-year-

old Thomas Siderio on March 1, 2022.

## SUMMARY OF THE GRAND JURY'S FINDINGS

## INTRODUCTION

On March 1, 2022, Thomas "TJ" Siderio (a twelve-year-old juvenile) and his friend, NK

(a seventeen-year-old juvenile), were riding their bikes in the area of 18th and Barbara Streets in

Philadelphia, PA at approximately 7:30 p.m. At around that time, they encountered officers from

the Philadelphia Police Department's Criminal Intelligence Unit - PO Edsaul Mendoza, PO

Kwaku Sarpong, PO Robert Cucinelli and PO Alexander Camacho (collectively, "CIU

Officers") - in plain clothes and driving an unmarked car. The CIU Officers initiated a pedestrian

stop of the boys because they recognized NK as tangentially connected to a stolen firearm

investigation involving a third person – Santo Primerano ("Primerano"). PO Sarpong pulled the

CIU Officers' car to a stop, and at nearly the same time activated the emergency lights for the

undercover car. Also, at nearly the same time, a shot went off and broke the rear, passenger-side window of the undercover car. After the shot went off, the boys ran up 1700 Barbara Street, where they separated, with Thomas Siderio running alone up the sidewalk toward Moyamensing Avenue, carrying a gun. PO Mendoza pursued Thomas Siderio, running up the middle of Barbara Street. He fired at Thomas Siderio a total of three times. His first shot was at the bottom of the block, near the intersection of 18th and Barbara Streets. He fired his second shot, mid-block, after Thomas Siderio had discarded his gun. Unarmed, Thomas Siderio then stopped running, and either fell or dove to the ground. PO Mendoza then fired his third shot from less than ten feet away from the child, and fatally wounded him. Within one minute after the third shot, PO Mendoza's partner, PO Camacho, approached and asked PO Mendoza where the gun was located. PO Mendoza told PO Camacho that Thomas Siderio had thrown the gun "somewhere around there," pointing back along the flight path in the direction of the gun, which PO Camacho immediately located. Following the fatal shooting, the Officer Involved Shooting Investigation Unit ("OISIU") began its investigation, and with the help of the Crime Scene Unit ("CSU") and various other entities within the Philadelphia Police Department gathered and analyzed evidence. Several witnesses appeared and testified in front of this Grand Jury. A summary of that testimony and associated exhibits follows.

## THE TESTIMONY

### The Investigation Pre-March 1, 2022

1. Three of the CIU Officers and their supervisor have appeared and testified regarding this incident – PO Alexander Camacho, PO Robert Cucinelli, PO Kwaku Sarpong, and Sgt. Vincent Butler.

Case ID: 240101396

2.  The four PPD witnesses testified to varying levels of knowledge and involvement in the investigation that led to the events of March 1, 2022.

3.  All four witnesses consistently stated that when the CIU Officers went on patrol on March 1, 2022, their primary target was Primerano and his involvement in a stolen firearm investigation.

4.  The officers wanted to find an address for Primerano, after identifying him as a person involved in the February 2022 stolen firearms investigation. They planned to give this address information to detectives from the South Detective Division for a search warrant on Primerano's home.

5.  Thomas Siderio was not the target of CIU investigators that night, and no PPD witness testified to having any information about Thomas Siderio possessing a firearm at any point during 2022. Both POs Sarpong and Cucinelli stated that they did not know Thomas Siderio, and had not even heard his name prior to March 1, 2022.

6.  PO Camacho monitored the Instagram account "Santo_215" in connection with the stolen firearm investigation and "215_nick" (the account purportedly belonging to NK) because the user of this account interacted with the user of the "Santo_215" account and appeared to also post about firearms.

7.  PO Camacho searched police databases for individuals named "Santo" to try to match the Instagram account with a person, eventually developing Primerano as a potential suspect.

8.  On March 1, 2022, Detective Quinn from South Detective Division showed PO Cucinelli some of the photos from the Santo_215 account and asked him to identify the individual in the Instagram photos. PO Cucinelli did identify him as Santo Primerano.

Case ID: 240101396

9.  The CIU Officers had no information of any criminal activity involving Thomas Siderio in 2022, and nothing involving NK or Primerano beyond their possible possession of a stolen firearm.

10. Based on the above identification, and the prior posts on social media with a possibly stolen firearm, the CIU Officers went on patrol that night to locate Primerano.

**March 1, 2022 – The Killing of Thomas Siderio**

11. On March 1, 2022, the CIU Officers were working in plainclothes, or regular street clothes, and they took an unmarked car out for surveillance.

12. In addition to working in plainclothes, the CIU Officers were also wearing bullet resistant body armor vests and had police badges hanging around their necks. PO Sarpong wore the vest underneath his shirt, whereas POs Camacho, Cucinelli and Mendoza wore the vest as their outer-most garment. Per testimony, each vest had a decal on the back that said "Police", but had no other markings on the front.

13. PO Camacho noted that normally the CIU Officers would have only had two officers in each car, but due to a shortage of police vehicles they went out as a group of four. An additional undercover car with PO McMahon and Agent McAdams of the US Secret Service also participated in the surveillance for Primerano.

14. PO Sarpong was the driver of the car with PO Cucinelli in the front passenger seat, PO Mendoza seated behind PO Sarpong in the rear driver's side seat, and PO Camacho seated behind PO Cucinelli in the rear passenger's side seat.

15. The CIU Officers first checked two addresses where Primerano previously resided and then later focused on the 18th Street area for surveillance.

4

Case ID: 240101396

16. According to the CIU Officers, they chose to focus on this area because the Instagram account associated with Primerano posted a picture of two individuals on bikes. The photo that is the subject of this Instagram post was presented to this Grand Jury as part of Exhibit 10. Although two bikes are visible, neither individual in the photo is visible beyond their legs and feet and it is not clear who is standing with these bikes.

17. Although the CIU Officers did not appear to have any specific reason for believing Primerano would be in this area with NK at this particular time, they thought that Primerano might be with NK in this area because they often "hung out" together around 18th Street.

18. For approximately one hour before the shooting. PO Sarpong parked the unmarked, dark-colored Chevy Cruze (with tint on all windows except the front windshield) next to the Commodore Barry Recreation Center. The Barry Recreation Center lies between Johnston Street to the north and Bigler Street to the south with 18th Street on its eastern boundary and 19th Street to the west.

19. PO Sarpong double-parked the Cruze on 18th Street between Barbara and Stocker Streets.

20. At around 7:30 p.m., the CIU Officers saw two boys on bikes riding southbound on 18th Street. The boys rode past their car and PO Sarpong decided to drive the car around the block and re-approach the boys from the south.

21. PO Sarpong did not activate the police lights at this point. None of the four officers in the car called for uniformed backup.

22. PO Camacho stated that upon seeing the two boys he recognized one of them as NK, but none of the four officers recognized the other boy, the smaller one, Thomas Siderio. Thomas Siderio was wearing a face mask that did not conceal his face.

Case ID: 240101396

23. As they circled back, the CIU Officers saw the two boys standing next to their bikes on the northeast corner of 18th and Barbara Streets.

24. The CIU Officers decided that they would stop the boys while they were in plainclothes and an unmarked car although Philadelphia Police Department Directives, specifically Directive 12.8, require that "police officers in plainclothes and detectives will not routinely make traffic stops unless the actions of the violator are a clear danger to pedestrian or vehicular traffic and no marked unit is readily available." None of the CIU Officers had seen either of the boys in possession of a gun when they made the decision to conduct the pedestrian stop and none of them saw the boys involved in any criminal activity. Nothing either boy did, before the initiation of the stop, required the CIU Officers to initiate the stop in an unmarked car with officers in plainclothes.

25. Several of the CIU Officers acknowledged that generally police should not make vehicle or pedestrian stops using unmarked cars or when they are in plainclothes. Sgt. Butler testified that Directive 12.8 does govern vehicle and pedestrian stops.

26. One of the purposes of working in an undercover capacity is to blend in and conduct surveillance, and thus, making traffic stops somewhat defeats that purpose. This practice of having an undercover unit make a traffic stop also goes against general police practices beyond Philadelphia directives.

27. The decision to initiate a pedestrian stop when officers are in an unmarked vehicle and wearing plainclothes is also tactically problematic, and wearing a badge around the chest is not an effective way for officers to identify themselves.

28. Further complicating the stop, none of the CIU Officers had any information that any information that NK was in possession of the stolen firearm at any time within the

Case ID: 240101396

previous week. The only evidence of his possession of a gun that appeared to be the stolen firearm was in an Instagram live video posted approximately one week earlier inside of a home and not on the street.

29. Indeed, their purported reason for the stop varied somewhat between the CIU Officers. PO Sarpong, the driver, and the person who had actual control over the car, and therefore, the decision to make the stop asserted that "We were stopping [NK] in particular to get a good address on [NK] because we was pretty much planning on doing a social media job on him because we knew he was 17 years of age." PO Sarpong did not say anything about wanting to stop Thomas Siderio.

30. Sgt. Butler, the supervisor for the CIU Officers, offered a similar explanation for the stop, stating that they were making the stop "[b]ecause they recognized one of the individuals as being involved in the investigation, meaning [NK]."

31. In contrast, PO Camacho and PO Cucinelli, both of whom testified on the same day – March 18, 2022 – and after PO Sarpong and Sgt. Butler, for the first time stated that they intended to stop the boys for a traffic violation, i.e., riding their bicycles the wrong way on 18th Street, in addition to the firearms investigation.

32. Neither officer offered this reason when questioned by OIS investigators on either March 1 or March 3. Neither PO Camacho nor PO Cucinelli appear to have told their supervisor about this reason for the stop, and it appears nowhere in the subsequent police paperwork.

33. PO Camacho, after asserting that issuing a motor vehicle violation ticket was part of the reason for their stop, later acknowledged that he did not give anyone a ticket during this entire encounter and "we never – I don't give tickets for the most part."

Case ID: 240101396

34. Despite making the decision to conduct a stop, PO Sarpong did not put on the lights to indicate that this was an undercover police car while they drove up to the boys, the earliest he put the lights on was immediately before the gunshot went off, as the car was slowing to a stop. The timing of the shot relative to the activation of the lights, however, is not clear.

35. With the exception of activating the unmarked car's emergency lights, none of the CIU Officers announced themselves as police officers.

36. As the unmarked car came to a stop north of the intersection of S. 18th and Barbara Streets, the CIU Officers heard a gunshot from the corner. NK also heard a gunshot at about the same time, but neither NK nor the CIU Officers saw who fired the shot.

37. After the gunshot, a projectile hit the rear passenger side window of the unmarked car, shattered the glass, and caused glass shards to hit PO Camacho in the face.

38. All four CIU Officers exited the car, following proper procedure that they should exit a car that is taking fire.

39. PO Sarpong got out of the car and took cover behind a Nissan SUV which was parked at the corner of 18th and Barbara Streets.

40. After taking cover behind the Nissan, a few seconds passed and PO Sarpong looked out from behind the car and down 1700 Barbara Street. At that point he heard a gunshot, and according to him, felt a bullet fly past his face.

41. After hearing the gunshot, PO Sarpong discharged once up Barbara Street "in the direction where [he] believe[d] the gunshot was coming from", although he did not have any specific target. After firing, he took cover again behind the SUV, heard two more gunshots, and then came back out from behind the cover of the SUV to reassess.

Case ID: 240101396

42. PO Camacho, meanwhile, immediately held his face and felt pain after the shot came through the door because glass had hit him in the face.

43. PO Camacho saw the other officers getting out of the car and running away. He also heard additional gunshots, but did not see what happened down Barbara Street. PO Camacho does not recall how many shots he heard.

44. PO Cucinelli got out of the car along with the other three CIU Officers and took cover behind a parked car. PO Cucinelli took cover because he heard additional gunshots after the first one and wanted to be cautious given the tactical uncertainties of the situation.

45. PO Mendoza ran ahead on his own up Barbara Street. None of the other three CIU Officers saw what happened at the other end of the street.

46. Surveillance video, however, did capture the pursuit up Barbara Street from the corner. Primarily two cameras – a WYZE camera placed at 17XX Bigler Street, facing out the rear of the property onto 1700 Barbara Street, and a Ring Camera looking out the front of a home on 1700 Barbara Street.

47. Det. Peter Marrero of the OISIU created a compilation entered as Exhibit 4 which merged video from the WYZE camera and audio from the Ring camera. This Grand Jury watched both the individual videos and the compilation.

48. Given that this is a video at night, the camera loses some of the detail of the incident, but the following is visible and audible.

49. At approximately 20 seconds into the compilation video (Exhibit 4), there is a pop sound that resembles a gunshot. A six to seven second pause follows this pop at which point there is some yelling and two additional pops in rapid succession.

Case ID: 240101396

50. Within one to two seconds of the two gunshots, an individual – Thomas Siderio -- runs along the sidewalk on the northside of 1700 Barbara Street. Thomas Siderio runs past a white van (the second car parked from the upper left corner of the screen) at 27-28 seconds. This van is significant because it is the location where Crime Scene later recovered the firearm that Thomas Siderio apparently possessed.

51. At approximately 32 or 33 seconds an individual – PO Edsaul Mendoza -- comes into view running in the middle of the street on 1700 Barbara. He shouts something and then fires a shot. At about this same time, Thomas Siderio dives or falls to the ground. At this point, Thomas Siderio is unarmed and on the sidewalk along the driver's side of a pickup truck parked on the north side of Barbara Street, while PO Mendoza continues running up the middle of Barbara Street.

52. It is apparent that Thomas Siderio stops running, although the camera view of his full body is blocked by a pickup truck, because when PO Mendoza approaches this truck, he slows down and then turns to run onto the sidewalk from the street, cutting between the back end of the parked truck and an adjacent parked car. Additionally, the viewer never sees Thomas Siderio flee past the pick-up.

53. PO Mendoza does not take cover during his approach, which would have been the tactically correct decision if he believed Thomas Siderio remained armed. Instead, he chooses to follow the "exact opposite" tactical strategy that would be expected if he thought there was "any possibility" that Thomas Siderio remained armed. Specifically, he runs up the street, completely exposed, without backup, and then runs between two parked cars through the "fatal funnel" to confront Thomas Siderio, who was behind the cover of the pickup truck.

Case ID: 240101396

54. Professor Seth Stoughton, an expert in police training and tactics as well as uses of force, testified before this Grand Jury and defined the "fatal funnel" as "any time officers are moving through a predictable narrow area. So a doorway is the best example of the fatal funnel, but also a hallway. Anywhere that the officer is going to be in a predictable position. In order to enter this room, you have to go through the door. Well, if someone has to go through the door, what that means is all the subject has to do is direct their fire, point their weapon in the area of the door and anything that goes through that door is a potential target."

55. Instead of taking cover or approaching cautiously, PO Mendoza runs onto the sidewalk without slowing or reassessing, finds Thomas Siderio unarmed and not fleeing, and fires one shot into Thomas Siderio's back from within ten feet.

56. Thomas Siderio was struck by one bullet in the back which passed through his body and came out of his chest. This single gunshot wound killed him within 90 seconds.

57. Medical Examiner Dr. de la Garza concluded that this third shot caused the perforating gunshot wound that killed Thomas Siderio. She based this conclusion on the likely positioning of Thomas Sidero's body at the time of the shot, meaning Dr. de la Garza concluded that at the time that PO Mendoza shot Thomas Siderio, he (Siderio) had turned his body slightly. From the footage in Exhibit 4, it appeared to her that as PO Mendoza came between the two parked cars and onto the sidewalk, Thomas Siderio turned slightly to his right. Dr. de la Garza observed this movement on the video and concluded it was consistent with what she saw with respect to the wound through Thomas Siderio's back and chest, thus, the third shot struck and killed him, not either of the previous two.

Case ID: 240101396

58. Further, in Exhibit 4, after Siderio stops running, movement is visible in the area where he stopped. After the third and final shot, Thomas Siderio's body disappears from the screen and moaning can be heard briefly before the moaning stops within approximately five seconds.

59. The Medical Examiner found that the cause of death was a perforating gunshot wound to the chest. The manner of death was homicide.

60. At approximately 1 minute, 50 seconds in the compilation video, PO Camacho comes onto the screen walking in the middle of 1700 Barbara Street. He asks PO Mendoza, "where's the gun?" at approximately 1 minute 55 seconds, to which PO Mendoza replies "he threw it around there" while walking down 1700 Barbara and pointing in the direction of the white van parked next to 1739 Barbara Street. PO Camacho then immediately walks toward the white van where he finds and secures the gun. This video is corroborated by PO Camacho's testimony.

61. Additionally, a Crime Scene Photo in Exhibit 12 taken from behind FCC 5 (the FCC located near Thomas Siderio's body) facing westbound down Barbara Street shows the white van located next to 17XX Barbara Street where the gun was recovered. This photo is significant because it provides the view from the area where PO Mendoza stood when he told PO Camacho that Thomas Siderio "threw it around there." The gun is not visible in this photo and neither is the number 5 evidence marker placed next to it. There are also a number of obstructions on the sidewalk that would have blocked PO Mendoza's view, including trash cans along the sidewalk. This photo further corroborates that when PO Mendoza told PO Camacho that Thomas Siderio threw the gun back along his (Siderio's) flight path, it was because PO Mendoza saw or heard the boy throw the gun as he ran up

Case ID: 240101396

the street and thus PO Mendoza believed that Thomas Siderio was unarmed at the time of the discharge.

62. After he was struck, Philadelphia police transported Thomas Siderio to Presbyterian Hospital within minutes of the discharge.

63. Thomas Siderio was pronounced deceased at the hospital at 7:59 p.m.

## The Immediate Aftermath

64. Marked units began to arrive on the scene, as well as the Crime Scene Unit, and the CIU Officers' supervisor, Sgt. Vincent Butler.

65. Sgt. Butler spoke to the CIU Officers on the scene. Upon finding PO Mendoza, Sgt. Butler asked which officers discharged, to which PO Mendoza replied that he, PO Mendoza, had discharged, and that PO Sarpong had also discharged.

66. Sgt. Butler later drew a map recounting what he had learned from the discharging officers when interviewed by the OISIU team.

67. PO Sarpong told Sgt. Butler that he (Sarpong) took cover behind an SUV at the corner of 18th and Barbara Streets and discharged once at the corner of the block. In Exhibit 8, Sgt. Butler's map, there is an "X" on the map drawn by Sgt. Butler in the presence of Det. Murawski at OISI at the intersection of 18th and Barbara Streets with "Sarpong" written next to it. This "X" indicates the approximate area where PO Sarpong said he had discharged his single round.

68. PO Mendoza told Sgt. Butler that he fired his first shot in the same area – around the intersection of 18th and Barbara Streets – indicated by an "X" with PO Mendoza's name written next to it in exhibit 8.

Case ID: 240101396

69. The arrows on Exhibit 8 show the paths of Thomas Siderio and PO Mendoza up Barbara Street, respectively, the first on the sidewalk, and the second in the street. This description correlates with what appears on the surveillance video from 1735 Bigler Street.

70. Sgt. Butler also indicated on his map the location of the gun that was recovered, which was 1739 Barbara Street, marking it with an "X" and the word "gun". Approximately parallel to this location are two additional "X" marks with Mendoza written next to them.

71. Sgt. Butler indicated that the two "X"s in the street are an "approximate area, that was where the route that he [Mendoza] was taking where his second, where he discharged again." Sgt. Butler further clarified that PO Mendoza told him that "[Mendoza was] running up the block, he [Thomas Siderio] was on the sidewalk, [Siderio] pointed the gun at [Mendoza], [Mendoza] fired two more times."

72. According to Sgt. Butler, PO Mendoza told Sgt. Butler that he fired all three shots from the street. He did not tell Sgt. Butler that he fired any shots while standing on the sidewalk. Available video contradicts this account of events.

73. Sgt. Butler further clarified that he marked the two "X"s on the map to note "this is where he [PO Mendoza] said to me [Sgt. Butler], this is where I was when the gun was pointed at me and I discharged twice."

74. It is clear based on witness testimony, crime scene evidence, and audio and video evidence available, that by the time PO Mendoza fired his second of three shots, Thomas Siderio did not possess a gun and could not have pointed it at PO Mendoza.

75. When questioned further about PO Mendoza's position for these final two shots, Sgt. Butler attempted to obscure PO Mendoza's location when he fired the two shots stating

Case ID: 240101396

that "it wasn't clear to me that he (Mendoza) fired two more times at that location or whether it was one there and one at the top of the block. That wasn't clear to me." However, Sgt. Butler did not tell Det. Murawski when he marked these two "X"s on the map that he was not clear on PO Mendoza's position when he fired the last two shots. In fact, Det. Murawski had a different understanding.

76. Immediately after the shooting, Sgt. Butler told Det. Murawski what information he gathered from the officers on scene about the location of evidence and the location of the officers' discharges.

77. Det. Murawski testified that Sgt. Butler put two X marks near the intersection of 18th and Barbara Streets with the name "Sarpong" and "Mendoza" written next to each. These marks indicated to Det. Murawski that the officers told Sgt. Butler that they discharged one time in the area near the intersection.

78. The CSU also found FCCs that matched the guns of PO Sarpong and PO Mendoza, respectively, in this area near the intersection of S. 18th and Barbara Streets.

79. Det. Murawski further testified that the two X marks next to "Mendoza" and approximately parallel with 1739 Butler Street, mid-block, indicated that PO Mendoza told Sgt. Butler that he discharged twice from this location.

80. Although PO Mendoza told Sgt. Butler that he fired twice from the street near the location of the gun, this statement is not true. PO Mendoza's actual third and fatal shot occurred much closer to Thomas Siderio, while PO Mendoza was standing on the sidewalk, mere feet away, with an unobstructed view of the no-longer-fleeing and unarmed boy.

Case ID: 240101396

81. The following facts suggest that PO Mendoza believed that Thomas Siderio was unarmed when he fired the third and fatal shot: PO Mendoza's close proximity to Thomas Siderio at the time the officer fired the fatal shot; PO Mendoza's statement about the location of the gun to PO Camacho, less than one minute later; PO Mendoza's decision to run straight up to Thomas Siderio when he could not fully see him, passing between two parked cars and failing to take advantage of cover; PO Mendoza's untruthful statement about where he fired his final two shots.

**The Investigation**

82. The CSU and Firearms Identification Unit ("FIU") both collected and analyzed evidence from the crime scene.

83. Of particular importance are the location of the Taurus firearm, the fired cartridge casings ("FCC"), the identification and connection between the recovered FCCs and the guns used at the scene, and the bullet or metal fragments found at the scene.

84. FIU investigator PO Norman DeFields testified before this Grand Jury regarding his findings. PO DeFields received and analyzed three firearms – P1, a police Glock 9mm firearm recovered from PO Sarpong; P2, a police Glock 9mm firearm recovered from PO Mendoza; and P3, a Taurus G2C 9mm recovered from the street next to 17XX Barbara Street.

85. PO DeFields also received and reviewed five FCCs recovered from the scene, marked as FCCs 1 through 5 in his report. The FCCs also correspond to numbers on the CSU Property Receipt 9032044 which in turn correspond to the yellow evidence flags visible in the CSU Photos and the maps. FCC 1, number 1 on the CSU map, was fired from P1, the gun recovered from PO Sarpong.

Case ID: 240101396

86. FCC 2 (number 2 on the CSU map) was fired from P3, the gun recovered from 1739 Barbara Street.

87. FCC 3 (number 4 on the CSU map) was fired from P2, the gun recovered from PO Mendoza.

88. FCC 4 (number 6 on the CSU map) was fired from P2, the gun recovered from PO Mendoza.

89. FCC 5 ( number 7 on the CSU map) was fired from P2, the gun recovered from PO Mendoza.

90. CSU located FCC 5 on the sidewalk, near the end of the 1700 block of Barbara Street, at the opposite end of the street from the corner of 18th and Barbara Streets where CIU Officers initiated their traffic stop of NK and Thomas Siderio, not far from the shoes of Thomas Siderio in the street, and near the approximate location of Siderio's body.

91. CSU found all five FCCs in locations that closely corresponded to the approximate locations of each discharge based on the testimony of the witnesses present and the available audio and video surveillance footage.

92. PO DeFields also analyzed four bullets and bullet jacket fragments – B-1, B-2, BJF-1, and BJF-2 – comparing them to the three firearms. PO DeFields' analysis eliminated P3 as the source of any of the bullet pieces, meaning none of these four bullets or jacket fragments originated from the Taurus, that is, the non-police weapon recovered at the scene, including B-1, the bullet that killed Thomas Siderio, recovered by Det. Marrero from hospital staff.

93. PO DeFields could not determine conclusively which, if any of the bullet fragments or bullets were fired by police Glock 9mms, only that the bullets could not have come from

Case ID: 240101396

the Taurus due to the "difference of class characteristics. Meaning, they were polygonal-type of rifling inside of that barrel. This is conventional. P-3 has conventional like this with sharp edges on the lands and grooves. Polygonal, it's more of a rounded or an octagon shape. So there is no way they were fired from Pistol P-3."

## CONCLUSION

PO Mendoza shot and killed unarmed, twelve-year-old Thomas Siderio. Thomas Siderio had likely fired the Taurus 9mm into CIU's unmarked police car as it was pulling up to him and NK, immediately causing three officers to take cover and PO Mendoza to begin a tactically unsound foot chase. Directly after taking cover, PO Sarpong fired once at no target in particular, without regard to his potential "backstop", or the neighborhood, and PO Mendoza fired three times: once at the beginning of the block near 18th and Barbara Streets, where the foot chase began, once in the middle of 1700 Barbara Street, and once at the end of the block, while standing on the sidewalk and relatively close to Thomas Siderio. At the time of the last two shots, Thomas Siderio was unarmed, having discarded the gun back at 1739 Barbara Street and just under 40 feet away. He had certainly stopped running and was possibly surrendering. PO Mendoza's second shot, as corroborated by video, audio, and crime scene maps, was fired while the officer was running mid-block on Barbara Street, past the car where the Taurus was located and secured by PO Camacho. This shot did not hit Thomas Siderio. Nearly simultaneous with this shot, Thomas Siderio stopped running and went to the ground (either because he fell or dove). PO Mendoza then slowed down and changed direction, showing that he knew that Thomas Siderio had stopped and where he was located. PO Mendoza's approach to Thomas Siderio was then completely inconsistent with PO Mendoza believing that Thomas Siderio was armed. He approached Thomas Siderio even though Siderio was behind a parked car, when the child could have been taking advantage of cover. PO

Case ID: 240101396

Mendoza's approach also required PO Mendoza to pass through an opening between the cars directly into his suspect's potential line of fire. PO Mendoza did not hesitate even a moment to enter this "fatal funnel." When PO Mendoza fired the third shot he was within half a car length of Thomas Siderio and thus would have had the opportunity to see Thomas Siderio clearly at the time of firing. Finally, PO Mendoza told PO Camacho immediately after the shooting that Thomas Siderio "threw it [the gun] around there," pointed to the location of the gun, and walked a few paces back toward 17XX Barbara Street. PO Camacho then immediately went to the location of the gun and secured it. The gun was sitting on the street, below the curb line, nearly 40 feet away, and behind a series of obstructions, including trash cans on the sidewalk, meaning PO Mendoza could not see the gun from where he was standing when speaking to PO Camacho. Thus, when PO Mendoza fired the third and fatal shot, he knew that 12-year-old, 5 foot tall, 111 pound Thomas Siderio no longer had a gun, and therefore, no ability to harm him.

## RECOMMENDATION OF CHARGES

Based upon the evidence that we have obtained and considered, which establishes a *prima facie* case, we, the members of the 31st Philadelphia County Investigating Grand Jury recommend that the District Attorney or his designee institute criminal proceedings against defendant Edsaul Mendoza and charge him with the following offenses:

**Murder of the First Degree, 18 Pa. C.S. § 2502(a)**
**Murder of the Third Degree, 18 Pa. C.S. § 2502(b)**
**Voluntary Manslaughter, 18 Pa. C.S. § 2503**
**Possession of an Instrument of Crime. 18 Pa. C.S. § 907**

Case ID: 240101396